Good morning. May it please the Court. My name is Betsy Stevens for the appellant, Ms. Deborah Cantrell. And if it's okay, I would like to reserve three minutes. Sure. Thank you. This is a Social Security disability case, and the first issue is that the ALJ at Step 2 made an error when she failed to find Ms. Cantrell's cervical degenerative disc disease, bilateral carpal tunnel syndrome, and migraines to be severe impairments. And this is important because this error affected the ALJ's analysis of all the rest of the evidence in the case, and it had sort of a cascading effect throughout the rest of the decision. One of the major reasons that the ALJ ultimately rejected Ms. Cantrell's credibility was because the ALJ didn't believe that there was enough objective medical evidence to support the claims of pain that Ms. Cantrell made. Well, okay. Go ahead. I want to make sure I have the chronology just right. The ALJ hearing, according to my records, was held in February of 2008, is that right? That's correct, Your Honor. And then the ALJ issued her ruling on March 27, 2008. That is correct. In the meantime, between the hearing and the decision, the claimant had an X-ray that showed objective evidence of disc disease, is that right? Yes, Your Honor. Question 1. Was that ever brought to the attention of the ALJ? Well, the X-ray itself, it was done before the decision was rendered, but after the hearing. Understood. So I'm not really. Was that ever brought to the attention of the ALJ? I'm not sure, Your Honor. I think, I know it was submitted to the Appeals Council after the hearing. Next question. Went up to the Appeals Council. They acknowledged receiving it and didn't otherwise discuss it, as far as I can tell. That's right. What do we make of that? Well, the Appeals Council erred in failing to note that this X-ray showed objective medical evidence for why Ms. Cantrell had so much neck pain. Okay. So if we agree with you, what should we do? Say, send it back to the, what, the Commissioner or the ALJ? I don't, I'm not sure what our next step would be. Send it back to the Appeals Council to consider it or send it back to an ALJ to consider  Well, that's one possibility, but we request a remand for payment of benefits because when this Court looks at all of the evidence, including this X-ray, then you go back through the rest of the decision and see that the ALJ improperly rejected Ms. Cantrell's testimony based on what the ALJ thought was a lack of objective evidence. I know that you want to win that way, but there's, but it also says, the X-ray also said she should do a follow-up MRI. Did she do that? I am not aware of whether or not she, I know it's not in the record. If she did, it was afterwards. Well, you know, but then there's that, so what are we going to wait, then we send it back and tell the ALJ to consider the 2008 X-ray and the ALJ comes to the same conclusion and then she decides, okay, now I'm going to get the MRI. I mean, there's a lot of resources that go into all of this. So why don't you do that? Well, she's, Ms. Cantrell has stated on the record that she doesn't have the money for further surgeries and tests and she doesn't have medical insurance. And part of the reason that she hadn't had carpal tunnel surgery again was because she didn't have the money to do so. And that's possibly the reason why she didn't follow up with the MRI also. Help me understand the relevance of the 2008 X-ray. We're talking about disability as of what date? She alleges disability as of April 20, 2005. And was the ALJ adjudicating disability as of that date? I believe so, Your Honor. And what happens if she's only disabled as of 2008? Well, she may or may not be eligible. She applied for both Title II benefits and Title XVI, I believe. So that means if she's no longer insured as of 2008 for Title II, then she wouldn't get that. She would only get SSI. But is there ‑‑ but she might get something if she shows disability as of 2008. I'm trying to figure out if the 2008 condition is relevant in and of itself or only relevant insofar as it tells us the condition she might have been in in 2005. Well, we believe that it does relate back to some extent. I mean, there are other impairments that she also has in addition to the neck disorder. She has a whole lot of things wrong with her. And the ALJ was also said that, I mean, she still continues to smoke. The ALJ thought she exaggerated, you know, did a lot of things wrong. So there's a lot going on. She has a lot of things wrong with her. And I think the ALJ could have found, you know, if we were here in the situation that the ALJ felt that she was disabled, that that would be something that the ALJ could have found. The ALJ went the other way. And so now it seems to me that this 2008 X-ray is we have to look at that and say if that had been considered, what would the effect have been, right?  And if you look at the X-ray, the X-ray, the neck disorder could also relate to her symptoms in her hands and arms. And she also has carpal tunnel syndrome, and she also has migraines. But all of these things could be related to the problems in her neck. A neck impairment of that nature can cause pain radiating down your arms, and it can result in headaches. All right. Let me ask you this. The record indicates that Cantrell was insured through March 31, 2009. If that's correct, did she file a new claim for benefits with a later onset date after the ALJ denied her claim? I'm not sure, Your Honor. Are you asking if she can or if she did? Did she? I don't know. Well, if the record said she was only insured through 2009 and we're in 2013, I mean, don't you know what's going on about that? Well, Your Honor, I only have the information that relates to this claim. I don't know what happened after she filed the appeal. I'm sorry. I don't know. I would assume that she would have been advised to file a new application, so she probably did. Well, you meet with your client, right? No? No, Your Honor. I've never. Is she still around? Yes. She's um, I haven't actually met Ms. Cantrell. I wrote the briefs and I read the file, but. Well, she had some other problems, too, here. Didn't she have some sort of felony conviction or something? Is she back in jail or what? You seem like you're being kind of dodgy here. Oh, I don't know. I've never met her because I don't typically meet the clients that I write these briefs for, or our office works the case. I live in Georgia. The cases come from Oregon, and my colleague, Mr. Wilborn, he's the one who speaks, actually speaks with the clients. So she's not, I mean, to my knowledge, she's not in jail. She's not, she hasn't passed away. She's still out there waiting for her benefits. Everybody's got to be somewhere. Still out there waiting for some money, okay. Did you want to reserve some time, did you say? Yes, please, Your Honor. Thank you. Thank you. Good morning. Good morning, Your Honors. David Burdett representing the Acting Commissioner of Social Security, Carolyn Colvin. To answer the question, yes, Ms. Cantrell was eligible for Title II benefits up until March 31st of 2009, or her insured status extended to March 31st of 2009. So albeit she was before the ALJ in 2008, she could have filed a new claim. I do not know whether she did. Also, there's a potential that if the Court sees it this way, that the 2008 evidence could relate to her disability as it was. That's the most, to me, that's the most problematic part of any of this, because it seems to me when it's, I mean, it's a fairly extensive record, and the ALJ could have gone either way. But the ALJ gives certain reasons, and the ALJ had issues with, you know, there's no doubt why she continued to smoke when she had all these, you know, there's just all sorts of things. But the ALJ also seemed to hook on that there was no objective medical evidence for, to support her disc situation. And the 2008 x-ray seems to give some support to that. So we have to decide what effect that would have had on the ALJ. Yeah, you do. And it seems like that thread sort of goes through into any number of things. And it's a little, I don't know, it's a little disgruntling here that we don't even know where she is. We don't even know what's going on. We don't even, you know, that we're dealing with this whole abstraction here, because if you look at the other cases, most people know where, what's going on. But if it would have an effect on her reasons, or was it, I don't know, the ALJ, I can't recall if it was a man or a woman, but it would have an effect on why the ALJ discounted opinions of counsels treating medical providers, and then it would seem that she wants us to just order benefits, but the other alternative is just to send it back to the ALJ and have a look at it, right? Yes. If you find that when the evidence is viewed in the light of the entire record, including this evidence that was submitted post-hearing in 2008, that there was not substantial evidence in support of the ALJ's decision, then you send it back. I understand that you're disgruntled. I'm pretty disgruntled about it myself. But that's the world that we live in post-Bruce, that when this post-hearing evidence is submitted, regardless of the fact that the ALJ did not have the opportunity to look at it, the reviewing court is tasked with looking at it and deciding whether, in the light of the record as a whole, including the post-hearing evidence that the ALJ never got to see, there is substantial evidence to support the ALJ's decision. I don't fault the ALJ. I'm questioning why the appeals counsel didn't do more than just acknowledge receiving it. I don't know that either, Your Honor. I do not know. But they acknowledged receipt. They saw it fit to put it in the transcript. And here we are. Well, it just seems to me that if absent that, I could find that the ALJ's decision is supported. But it seems that that 2008 X-rays got some tentacles into some of the underpinnings of what the ALJ had to say. Well, if I may, Judge Kagan, let me make an argument that you could still support the ALJ's decision even with this, because the credibility determination is not solely based on the lack of objective medical evidence. Now, when the ALJ said that, he was looking at the evidence from the MRIs of 2005 and 2006, which do not show any significant changes, mild, mild degenerative changes. But he also grounded it on her past history of a crime of dishonesty. And incidentally, I want to clean that up from my brief, because I used the term forgery, but that's not in the record. It was a felony conviction for writing a bad check. So that's my error. And that's what the ALJ said, felony conviction for writing a bad check. Her past history of dishonesty, her ability to drive at least short distances despite her claims that the medications made her woozy and she couldn't do anything, this sort of thing. There are reasons beyond just the lack of objective medical evidence to doubt that it was as bad as she claimed. Dr. Ames, there was a Dr. Stephan Ames who examined her for claims of diffuse generalized pain all over her body. And she tested positive in Dr. Ames' examination for 32, all 32 of the 32 potential trigger points for fibromyalgia, including control points, which negates the diagnosis. So there are good reasons that the ALJ gave for not finding Ms. Cantrell credible. And it is your task, unfortunately, to decide whether that constitutes substantial evidence, even when considering the 2008 MRI result. Well, if we did affirm the ALJ, what can, what avenues does she have available with this 2008 report? She can file a new claim alleging a new onset date of disability. And she can still get in in both Title 16 and Title 2 because her eligibility for Title 2 depends on her date last insured, which is in 2009. If we do that, though, what's the consequence, if any, to her of having them on the record, basically an adverse credibility finding by the ALJ? I mean, it's possible that if the ALJ had seen this 2008 X-ray, he would have gone back through and seen, oh, you know, maybe there's some objective evidence for a fair amount of this stuff. And he then might have been inclined to review some of the other things that suggest dishonesty in a different light. He might have. If she files a new claim, to answer that question, if she files a new claim at a later time with new evidence, it's not res judicata. So the adverse credibility finding, that's washed away as of 2008 forward. As a legal matter, as a practical matter, may be not entirely washed away. Well, it may not be. It may not be, Your Honor. It's tough. It's tough. It's not very satisfying. Excuse me. I've kind of laid out the credibility issues, and frankly, it's the bruise matter that is troubling about this case. Can I answer any other questions about the ALJ's finding? I don't need anything. Well, it's a gestalt, and it's not merely this question. In the end, the ALJ finds that she's capable of doing three jobs that are available in the thousands in the national economy. A small parts assembler. I thought all those jobs were in China. A machine tender, or sometimes it's called on the record a machine trimmer. I have no idea what a machine trimmer is. I guess a machine tender is just to sit beside a machine. And an addresser. This woman is a, to state it generically and politely, this woman is a mess. It is entirely unrealistic for me to expect, for anyone to expect, that she will get a job in any of those three categories. This strikes, but it's not just this case. This is just fantasy land. I mean, tell me realistically what a small parts assembly job is and where you can get one. I can't tell you where you can get one, Your Honor, but a vocational expert could, and that's what we have in the record. Yeah. But this is not even, I'm not even after you. I'm not even after this case. It just strikes me as we've got some terms of art here that just are in Never Never Land. What about her felony conviction? That's a problem for her. And how does that factor, that narrows a lot of jobs out, right? Yeah, but that's, yes, Your Honor, it does. But she can't get, she can't benefit from that, right? Correct. That is not a vocational factor that we consider when determining whether a person can perform substantial gainful activity. And I suspect, although this is every bit as speculative as what Ms. Stevens put up here when she could have and would have and might, I suspect that the felony conviction may be behind a lot of this, as she talked to, I think it was Dr. Scott, and said that she was having trouble getting employment until the felony conviction could be expunged seven years later. So there are hints and indications, but I don't know. Yeah. Let me ask a wholly unrelated question. I'm happy to have you here today, but we've been getting motions from government counsel because of the shutdown saying they can't travel and so forth. Does that not affect your office? Yes, it absolutely does affect our office. We've got authority. There are 44 of us in my office. Three people are accepted employees. Since we don't characterize people as essential and nonessential anymore for fear of hurting my feelings. But there are three other people are accepted employees, and I was specifically accepted for yesterday and today to come down here and do this. I'm going to go home, turn in my badge, and wait for Congress to come up with a solution. Good luck. Thank you. Thank you. Thank you. Okay. Ms. Stevens. Okay. A couple of quick things. Going back to the felony conviction issue, what's in the record is that she wrote a badge check once upon a time. At least as far back as 2006, and it may have been well before that. And the only reason that it's in the record is because she admitted it to her mental health therapist as a part of seeking help for a mental illness. And otherwise the ALJ, no one would have even known about that. But that doesn't do you any good. It's there. Right. Well, I mean, it's there, but it's not as if she's continued to lie about it all this time. She took responsibility for this mistake, and she sought mental health treatment. And additionally, even if the neck impairment, even setting aside the 2008 X-ray, the neck impairment, we have Dr. Kaplan saying that these migraine headaches were occurring on an unpredictable basis and would have prevented her from attending work on a reliable schedule. And we have Dr. Scott, the psychologist, who said that because of her mental illnesses, including borderline personality disorder, that she would need one-on-one help in order to complete basic, in order to develop work skills, and that she would have trouble completing basic work tasks because of her mental illness. And we have Nurse Finley, who, with the three jobs that the judge identified at step five, these small parts assembly and so forth, each one of those requires the ability to reach, handle, and finger with both hands. I believe it's frequently. And Nurse Finley said that her reaching, handling, and fingering ability would be limited. So those jobs would not be available if you accept Nurse Finley's opinion. And if we go back to that X-ray, and if the ALJ had seen the 2008 X-ray, then it's probable that she would have found differently at all these other steps. So was someone from your office in front of the appeal part of this? Yes, Your Honor. And they never called it to the counsel's attention? Do you mean the X-ray? Yeah. It was sent to the appeals counsel, and I believe there was a brief sent with it or a note, and the appeals counsel just declined to address it. And we don't know why. I don't think there was an explanation. They just said this information is not enough to overturn the ALJ's decision. I'm looking at the appeals counsel order, and it says the appeals counsel has received the following evidence, which is making part of the record. It's Exhibit 24F, attorney-slash-representative supplied evidence from the radiology group. Okay. That's the X-ray, right? That must be the X-ray. X-ray report, I guess. Yeah, so they clearly got it. They acknowledged getting it. But they don't tell us what consequence, if any, they attached to it. They don't tell us. Okay. Let me ask you a different question, again, unrelated to this case. As I'm sure you know better than we do, the Wilburn office is the primary litigator of Social Security disability cases in front of this Court. Whenever I come to Oregon, I look forward to some case from your office. I gather that you're routinely employed by that office, even though you work in Georgia? I'm sorry. Can you repeat that last sentence? I gather you are routinely employed by that office, even though you work in Georgia. Yes, Your Honor. I write briefs for them on a regular basis. Okay. I've seen the Wilburns. This is the first time I've seen you. Welcome. Okay. Okay. If that's it, I'll rely on my briefs. Thank you very much. Thank you. Thank you, Ms. Stevens. Mr. Burdett, thank you. Good luck with your exemption or non-exemption. And we'll stand at recess for the day.
judges: Silverman, Fletcher, Callahan